[S. F. No. 14704. In Bank.—December 1, 1933.]

E. F. HENDERSON et al., Appellants, v. M. JACOBS et al., Respondents.

Charles C. Boynton and John T. Boynton for Appellants.

Fitzgerald, Abbott & Beardsley for Respondents.

SEAWELL, J.—This action was brought by plaintiffs, owners of stock of the Fairmede Golf and Country Club, a corporation, in their representative capacity against the defendants. The gravamen of the complaint consists of allegations of fraud and conspiracy on the part of a majority of the directors of said corporation. Plaintiffs sought by the action to impress a trust upon certain real property formerly held by the defendant corporation and prayed for an accounting and for general relief. Judgment went for the defendants and plaintiffs are before the court on an appeal from the judgment.

It may be stated at the outset that it is the duty of appellate courts to sustain the judgments of trial courts if they can, with reason, do so. This rule, of course, must control us in our consideration of the instant case.

The transactions which give rise to the action are unusual. That the project which all the parties to the suit were engaged in promoting was purely speculative in its inception,

and was without substantial financial support or backing, will appear from a brief review of its organization and methods resorted to in an effort to promote the enterprise.

In the month of November, 1924, Gertrude H. Collins, the wife of Robert Collins, was the owner of a large tract of land situate in the county of Contra Costa, of which the land involved in this action was a part, all of which was covered by a blanket mortgage held by The Oakland Bank. A portion of the above acreage was sought as a golf course and clubhouse site. A syndicate or association was formed, consisting of Robert Collins, husband of Gertrude H. Collins, J. M. Ough, Gwynn Officer, Charles M. Woods, E. F. Henderson (a plaintiff herein), McClymonds and Wells (attorneys at law), and other persons whose names do not appear in the pleadings, to promote the enterprise and devise ways and means by which a portion of Mrs. Collins' said real property might be purchased and the clubhouse constructed and the golf course and grounds put in order in consummation of the purpose of said syndicate. By the terms of the syndicate agreement it was provided that a corporation should be organized at a later and more propitious season. In furtherance of the plan Robert Collins, manager and agent for his wife, was to cause to be conveyed approximately 151 acres of his wife's said acreage for the use and benefit of said enterprise, in consideration of a $37,500 cash payment, plus stock of the par value of $37,500, to be issued to the Collins by the corporation when it should become organized. Henderson was to contribute the clubhouse; Ough was to dig the wells for the water supply; Woods was to furnish and install a fairway sprinkling system. Others were to contribute to the enterprise by furnishing materials, equipment or services which were definitely specified in the syndicate agreement.

The promoters of the undertaking and those associated with them were from the first without available funds necessary to finance an enterprise which would require a large outlay of moneys. The plan of the syndicate agreement providing for the raising of funds with which to pay the purchase price of the land and make the improvements necessary to put the property in shape for a golf course and country club from cash subscriptions realized from persons not members of the syndicate failed to bring in any funds.

No money was forthcoming from that anticipated source. The syndicate was therefore without the $37,500 cash to pay Mrs. Collins, but in the meantime the members of the syndicate or association continued to lay out a golf course, build a clubhouse, install a water supply and fairway sprinkling system, and otherwise improve the 151 acres which it had negotiated to purchase, but the title to which was still in Mrs. Collins. Henderson had built the clubhouse of the estimated value of $56,200; Woods had furnished the sprinkling system, of the appraised value of $20,000. Claims held by other members of the syndicate who had furnished materials, fixtures, furnishings or equipment, or who had performed services in the improvement of said golf course, swelled the above sums to an aggregate approximating $140,000. In addition to the sum last named, creditors of the syndicate who were not members of it held claims against said syndicate in sums aggregating $40,000 for and on account of services rendered or materials furnished in the construction or improvement of said golf course.

On or about July 15, 1926, through the negotiations of a creditors' committee selected by the creditors and members of the syndicate at a meeting called for that purpose, said Gertrude H. Collins, in consideration of $45,000, granted said 151 acres of land to Joseph M. Ough, as trustee for the plaintiffs and for all creditors and members of said syndicate and said corporation Fairmede Golf and Country Club. No money passed, but a joint and several promissory note in the sum of $45,000, secured by a mortgage on said golf course and country club, was executed in her favor by Joseph M. Ough, E. F. Henderson, plaintiff herein, Vance McClymonds, Gwynn Officer, H. Pickard and M. Jacobs. In December of that year said Gertrude H. Collins assigned and transferred said note and mortgage to The Oakland Bank.

At the sale of said real property made on October 5, 1929, under foreclosure proceedings said M. Jacobs, a director of the Fairmede Golf and Country Club and a joint and several maker of the note upon which the foreclosure suit was brought, and who was liable for a deficiency judgment, bid in the property for $54,327.01, this being the amount of the foreclosure judgment and costs. The court found the value of the land and improvements on the day of sale and for the following year to be $56,764, subject to $2,490 for taxes,

aggregating a sum slightly above the value of the property as found by the court.

Some time after the creditors' meeting held in July, 1926, an agreement was entered into between the numerous creditors of said syndicate and the Fairmede Golf and Country Club and the members of said syndicate to incorporate said Fairmede Golf and Country Club, with a capital stock of $300,000, consisting of 30,000 shares of the par value of $10 each, 20,000 of said shares to be common and 10,000 shares to be preferred stock. It was agreed that J. M. Ough should deed said land to the corporation in consideration of said corporation issuing to the creditors of said syndicate and corporation preferred stock at par equal to the face amount of their respective claims, aggregating 4,383 shares, and issuing to the members of said syndicate in lieu of their claims common stock of said corporation at par equal to the face value of their claims, aggregating 11,017 shares. Said creditors' committee, representing all persons holding claims against the syndicate or corporation, directed said corporation to sell 2,400 shares of the corporation's preferred stock for cash for the purpose of raising money wherewith to conduct the business of the corporation. It was found and stipulated by said creditors' agreement that the Pacific Pipe Company was a creditor of said syndicate and of the Fairmede Golf Course in the sum of $16,990.85, and that said Pacific Pipe Company should receive 1699 shares of preferred stock in satisfaction of its claim.

Plaintiffs attack the allowance of this single claim on the ground that it was procured through fraudulent misrepresentations practiced by M. Jacobs, aided by the connivance of his accomplice, Sherman, and that the creditors' committee would not have allowed the same had it been truthfully informed as to its origin. The claim has its origin in the C. M. Woods pipe furnishing transaction. Said Woods, who was a member of the original syndicate group, agreed to furnish and he did furnish the pipe for the sprinkling system for which he was to receive stock in the sum of $20,000. Woods died June 25, 1925, a few months after the project was inaugurated. At the time of his death he was indebted to the estate of one Jacob Pantoskey, the predecessor of Pacific Pipe Company, in the sum of $17,043.40 for the pipe furnished to him by Pantoskey, and which material

Woods furnished to the syndicate in the performance of his agreement with said syndicate. Pantoskey in his lifetime conducted his business under the name of Pacific Pipe Company. M. Jacobs was his son-in-law. Upon Pantoskey's death Jacobs caused the Pacific Pipe Company to be incorporated. He became the president and manager of said corporation, as the successor of the estate of Jacob Pantoskey, and claimed to be the owner of said $17,043.40 claim on account of the pipe and material furnished by Woods to said syndicate. No question seems to have been raised by plaintiffs as to the right of the Pacific Pipe Company to succeed to the estate of Pantoskey, including said $17,043.40 claim, but it is contended that said claim was a charge against the estate of Charles M. Woods solely, and that it was allowed and assumed by the creditors' committee as being a proper charge against the syndicate group by reason of false and fraudulent representations made to the creditors' committee by M. Jacobs, to the effect that said Jacob Pantoskey, doing business under the name of Pacific Pipe Company, was an original creditor of said syndicate, whereas in fact and in truth said Woods was the original creditor of said syndicate. A claim for the value of the pipe material was presented to the estate of Woods and allowed, but the estate being practically insolvent, only five per cent of the entire amount was paid, leaving a balance of $16,990 on account of the materials so furnished.

Plaintiffs' contention is that the insolvent estate of Woods is the debtor of the Pacific Pipe Company, and it must look alone to that estate for payment. The fact that it filed a claim against said estate would not of itself bar its right as a creditor of the syndicate group, or corporation, as found by the creditors' committee. The pipe company was entitled to have its claim paid in full by either the Woods estate or by the syndicate, which received the benefit of the materials. There can be no doubt, so far as anything appearing to the contrary in the briefs, but that Pantoskey or the pipe company could have filed a materialmen's lien and protected itself against loss. Whether or not a waiver of the lien was the consideration for the allowance of the claim by the creditors' committee is not discussed in the briefs. But whether that is so or not, it is very clear that it was the plain, understanding and agreement of the com-

mittee with all the persons in interest that all persons who had furnished labor, services or materials of any kind in aid of the project should, in lieu of money, receive stock of the corporation equal in par value to the materials furnished or services rendered. To accomplish this end the committee met and canvassed each claim and made its decision as to the merits of each claim. The claim of the Pacific Pipe Company was for materials actually in place and which formed a substantial part of the improvement and added to its value at least $16,990. Said committee which investigated the merits of each claim was appointed for that specific purpose by common consent, and it was beneficially interested with all the other creditors in rejecting spurious claims. It is not likely that it was blind as to the facts, which must have been patent upon a most casual examination by the committee in the performance of its duty. This court would not be justified in setting aside the committee's findings that the Pacific Pipe Company was a creditor of the syndicate, which was but a forerunner of the corporation. It was stipulated by all the creditors as a fact that said pipe company was a creditor and was entitled to be so listed. The allegations of fraud and collusion on the part of Jacobs and Sherman were found by the trial court to be untrue upon a consideration of all the evidence, and no sufficient reasons appear that would justify this court in reversing the trial court's finding. The enterprise seems to have existed in a somewhat disorganized fashion under the joint supervision of its creditors and the syndicate members until June, 1928, at which time, with the consent of the creditors, the Fairmede Golf and Country Club was incorporated. In February, 1929, trustee Ough transferred the land held by him in trust to said corporation. At a directors' meeting held on February 21, 1929, a resolution was passed authorizing the sale of said land for a sum not less than $125,000. No sale was or could be made. The bank was pressing for its money. Taxes, interest and costs of upkeep were not being met. The bank threatened foreclosure and a deficiency judgment against the four defendant directors and the others who had signed the note unless all sums past due and a portion of the principal was paid. Ough had paid out some $3,000 or $4,000 on account of interest and accruing costs. No one seemed able or willing to come to the rescue of the corpora-

tion and proceedings were commenced which resulted in a foreclosure. Summons was served on the defendants therein, including the corporation. Notice of the proceedings was served upon each of the creditors, stockholders and persons in anywise interested in the enterprise.

Appellants in their brief say: "We are not questioning the legality of the purchase at the judicial sale. The point that we are stressing is the utter illegality of subsequent acquisition by these defendants, who were and continued to be in control of the corporation as the majority of its directors, of the corporation's equity of redemption in this property. Jacobs bid in the property at the foreclosure sale for a sum sufficient to pay the mortgage, interest and costs. Thereupon and thereafter the defendants who had been on the note were relieved of all liability for any deficiency. By reason of the equity of redemption in this property that remained in the corporation for one year following this foreclosure sale, these purchasing directors became affected with an interest adverse to their corporation. The interest of these defendant directors was to acquire from the corporation its equity of redemption in this property without paying the corporation any consideration therefor. There was just one way to do this with any semblance of legality in the transaction. That was to conceal the fact that the majority of the directors of this corporation were interested in the purchase of the property. This was done by leaving the title stand in the defendant Jacobs alone. As has been noted and cited above, this deceit was carried down into the verified answer of the defendants."

It is true that the answer contains the denial that in purchasing the property at execution sale Director Jacobs was acting for others than himself. The court found on this issue that he was acting in said purchase on behalf of himself and all of the other defendant directors, who were parties to the foreclosure action, except Fairmede Golf and Country Club. This inaccuracy was explained by the fact that Jacobs had urged his fellow directors to assist him to raise an amount to fully discharge the mortgage and thereby prevent a deficiency, but that they failed to do so until some time after the purchase, when they raised a small portion of the amount of the bid made by Jacobs. None of said directors and obligors upon the note was disqualified from protect-

ing himself against a deficiency judgment. There does not seem to be any reason why it was necessary to resort to subterfuge, notwithstanding plaintiffs' suspicions to the contrary, in order to conceal the identity of the purchaser at execution sale.

Appellants lean heavily upon the provisions of sections 2230–2234 of the Civil Code, which forbid a trustee from taking part in any transaction in which he has an interest adverse to his beneficiary. Section 2233 is especially stressed as supporting the rule upon which appellants rely as a bar to Director Jacobs' right to retain the land by reason of adverse interest. It provides: "If a trustee acquires any interest, or becomes charged with any duty, adverse to the interest of his beneficiary in the subject of the trust, he must immediately inform the latter thereof, and may be at once removed."

Appellants invoke the wholesome principle announced in *San Diego* v. *San Diego & L. A. R. R. Co.*, 44 Cal. 106, and which has found expression in a long list of cases, that where a trustee violates any of the provisions of sections 2230–2234 of the Civil Code or violates any provision of law designed to secure fidelity in the agent, the court will not permit any inquiry into the question of the honesty or fairness of the transaction, but will vitiate it as soon as an inconsistent relation between trustee and beneficiary is disclosed. The rule is quite inflexible in its application, and we would be compelled to respect it in this case if it was applicable to the facts in the instant case, as it was to the facts in the cited cases.

In *Snediker* v. *Ayers*, 146 Cal. 407 [80 Pac. 511, 512], this court, in construing section 2230 of the Civil Code and kindred sections, said:

"The above section applies to the directors of a corporation, but it was not intended thereby, nor is there anything in any other provision of the law which makes a transaction between a director and his corporation in which the former had a personal interest *ipso facto* void. Such a transaction is subject to rigid scrutiny and is voidable for any fraud or violation of the duties of their trust on the part of the directors. But it will not be held void where it is shown that the directors' actions were open and aboveboard, and taken in good faith without any purpose of fraud. (*Schnitt-*

*ger* v. *Old Home etc. Min. Co.,* 144 Cal. 603 [78 Pac. 9], and cases therein cited.)

"The plaintiff alleged fraud and collusion on the part of the directors, and the burden was on him to establish these allegations. The findings show the contrary." (See, also, *Kleinsasser* v. *McNamara,* 129 Cal. App. 49 [18 Pac. (2d) 423] ; Ballantine, Manual of Corporation Law and Practice, 1930 ed., 300.)

Further decisions might be cited, but the equitable principle is so sound as not to require further citations. ▉ That the creditors and stockholders were fully informed as to the filing of the foreclosure suit and the purchasing of the property by Jacobs at the execution sale, and that the director defendants were not guilty of concealing matters from the creditors or stockholders of which they were entitled to be informed, were matters for the chancellor's determination, and it cannot be said that he abused his powers in finding in respondent's favor upon the controlling issues of the cause.

The foreclosure sale occurred on October 5, 1929, and the action herein was filed October 6, 1930, one year later. Notwithstanding the equitable nature of the action it may be noted that none of the plaintiffs or stockholders or creditors have offered or expressed a desire to redeem said property, nor have they offered to repay to the defendants any sum whatsoever expended by them.

Judgment affirmed.

Waste, C. J., Shenk, J., Curtis, J., Preston, J., and Langdon, J., concurred.

Rehearing denied.